## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 12-80533-CV-MIDDLEBROOKS/BRANNON

FEDERAL DEPOSIT INSURANCE
CORPORATION, AS RECEIVER
FOR BANKUNITED, F.S.B.,

      Plaintiff,

vs.

PROPERTY TRANSFER SERVICES, INC.,
a Florida Corporation, FIRST AMERICAN
TITLE INSURANCE COMPANY, a
California Corporation, and DOES 1
Through 40,

      Defendants.

_____/

### OPINION AND ORDER

THIS CAUSE comes before the Court for final disposition of the issues presented during

a bench trial held from August 12, 2013 through August 14, 2013.[1]  Plaintiff Federal Deposit

Insurance Corporation ("FDIC"), as receiver for BankUnited, F.S.B. ("Old Bank"), asserts that

Defendant First American Title Insurance Company ("First American") is required to indemnify

the FDIC pursuant to two closing protection letters ("CPLs")[2] First American issued as a result

---

[1] After oral arguments held on August 14, 2013, the Court allowed the Parties to submit Post-Trial Briefs in this matter.  Plaintiff Federal Deposit Insurance Corporation submitted its Post-Trial Brief (DE 210) on August 21, 2013 and Defendant First American Title Insurance Company submitted its Post-Trial Brief (DE 211) on August 23, 2013.

[2] A CPL offers lenders indemnification "against damages arising out of certain claims which they may have against the agent of the title insurance company when a policy is to be issued, including protection against fraud and dishonesty of the issuing agent . . . in handling the lenders' funds or documents in connection with a closing."  Shawn G. Rader, *Closing Protection Letters*, 70 FLA. BAR J. 36, 38 (Dec. 1996).  CPLs issued in Florida are legislatively mandated. *See* FLA. STAT. § 627.786.  Rule 69O-186.010 of the Florida Administrative Code provides the language that must be included in a CPL. *See* FLA. ADMIN. CODE ANN r. 69O-186.010 (1991).

of its agent's, Property Transfer Services, Inc. ("PTS"), actions in regards to the closing[3] of two residential properties.[4]

This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). All proposed findings of fact and conclusions of law inconsistent with those set forth herein are rejected.

## I.   BACKGROUND

The instant case involves the sale of two separate pieces of property in May 2007: 2401 Northeast 65th Street, 1-206, Fort Lauderdale, FL ("Unit 206"), and 2401 Northeast 65th Street, 1-308, Fort Lauderdale, FL ("Unit 308"). Old Bank provided two mortgage loans (collectively, "Loans") on the condition that the buyer, Nathaniel Ray ("Ray"), deliver a cash payment at each closing[5] and a mortgage on each property.[6] First American provided title insurance for the Loans, with PTS acting as First American's designated agent. PTS was the title, escrow, and closing agent[7] for the two mortgages. Old Bank issued Loan Closing and Funding Instructions ("Closing Instructions") to PTS for each loan that provided an explanation of how PTS should conduct the closing. On April 30, 2007, First American issued two CPLs to Old Bank and its successors that required First American to reimburse Old Bank for any actual loss incurred as a

---

[3] A "closing" is "the final transaction between the buyer and seller, whereby the conveyancing documents are concluded and the money and property transferred." *Black's Law Dictionary* 291 (9th ed. 2009).

[4] On August 12, 2013, the first day of the trial, PTS and the FDIC informed the Court that they had settled the issues as between them. (Trial Tr. vol. 1, 6:11-20, Aug. 12, 2013). Under the terms of their settlement, PTS agreed to a stipulation for judgment in the amount of $400,000. That amount would be reduced by any judgment amount entered against First American. Regardless of the judgment against First American, PTS is required to pay at least $35,000. *Id.* at 9:7-13. PTS was excused from the trial proceedings. *Id.* at 9:17-23.

[5] As to Unit 206, Mr. Ray was to provide $36,476.10. For Unit 308, Mr. Ray was to pay $35,952.96.

[6] Old Bank offered Mr. Ray a mortgage loan totaling $274,500.00 for each property.

[7] A "closing agent" "handl[es] financial calculations and transfers of documents" during the closing. *Black's Law Dictionary* 74.

result of PTS's failure to comply with the Closing Instructions,[8] or PTS's fraud or dishonesty in handling Old Bank's funds or documents.

### A.   *Sale of the Two Properties*

The sale of Unit 206 and Unit 308 involved a mortgage fraud scheme involving a straw buyer who misrepresented his income, a down payment made by the seller with the lender's funds, an inflated appraisal, and a closing agent who turned a blind eye and allowed the fraud to occur.  In 2007, Mr. Ray, then a firefighter, was approached by his colleague Craig Turturo about buying Unit 206 from Kamel and Elizabeth Albert and Unit 308 from Brian Albert.[9]  (Trial Tr. Vol. 1, 50:8-13 (Ray)).  Craig Turturo, whose testimony I find not credible, claimed to be simply helping out a friend, but I believe served as a key member of this scheme.  Mr. Ray and Craig Turturo "worked out a deal" whereby Mr. Ray would buy the properties, secured with residential loans, but the sellers of the properties would provide the down payments.  *Id*. at 50:14-18.

The appraisals for the units were done by Frank Turturo, Jr., son of Frank Turturo, Sr. and Craig Turturo's brother.  *Id*. at 115:21-116:1.  U.S. Mortgage Bankers[10] secured the financing for the Loans on Mr. Ray's behalf through Old Bank.  Old Bank offered Mr. Ray two Stated Income/Stated Asset loans whereby Mr. Ray claimed an exaggerated annual income on the loan applications without providing any verification of that income to receive the Loans.

---

[8] Under the CPLs, First American would have to indemnify Old Bank when PTS's failure to follow the Closing Instructions relates to: (1) the status of the title or the validity, enforceability, and priority of the lien of the mortgage; (2) the obtaining of documents Old Bank required; or (3) the collection and payment of Old Bank's funds.  (*See* CPL dated Apr. 30, 2007, Trial Exh. J-57, J-58).

[9] Kamel and Elizabeth Albert are Brian Albert's parents.  Brian Albert testified during the trial and invoked his Fifth Amendment right against self-incrimination in response to questions regarding the disputed transactions.  (*See* Trial Tr. vol. 1, 103:15-107:10).  Mr. Ray, Craig Turturo, and Kamel, Elizabeth, and Brian Albert are not parties in the instant suit.

[10] U.S. Mortgage Bankers is Frank Turturo, Sr.'s client.

(*See* BankUnited Mortgage, Trial Exh. J-15, J-20). In addition, U.S. Mortgage Bankers, based on a referral by Frank Turturo, Sr., (Trial Tr. vol. 1, 114:1-17, 138:7-21, 200:17-201:1), presented the purchase and sale transactions to PTS.[11] Frank Turturo, Sr., Craig Turturo's father, was an independent sales representative for PTS. *Id.* at 113:22-114:5. For both of the sales transactions, PTS was tasked with ensuring the Closing Instructions were followed, including proper execution of closing documents and distribution of funds. Nicole Bensema ("Bensema") was the PTS closing manager responsible for overseeing the closings.

According to the United States Department of Housing and Urban Development Settlement Statement ("HUD-1") for each property, Mr. Ray, Kamel and Elizabeth Albert, and Leila Santa, a PTS closing agent Ms. Bensema supervised, signed the paperwork for Unit 206 on May 14, 2007. (HUD-1, Trial Exh. J-2). Mr. Ray and Brian Albert and Ms. Bensema signed the closing documents for Unit 308 on May 16, 2007. (HUD-1, Trial Exh. J-5).[12]

Line 303 of the HUD-1s, as certified by the PTS closing agents, stated that the Borrower, Mr. Ray, provided cash at the closing. *Id.* However, Mr. Ray did not bring cash or a cashier's check with him to the closings. On May 15, 2007, one day after the HUD-1 for Unit 206 was executed, Masterhost, Inc. ("Masterhost"), a third party corporation, wired $36,476.10 to PTS "FBO Nathanial Ray," meaning "for the benefit of" Mr. Ray.[13] (PTS's Current Day Wire Report, Trial Exh. J-26). On May 16, 2007, Masterhost transferred another wire for the benefit of Mr. Ray to cover the down payment in the Unit 308 sale for $35,952.96. (PTS's Current Day Wire Report, Trial Exh. J-27). Masterhost was not affiliated with Mr. Ray and Mr. Ray did not

---

[11] Christopher Albert worked at U.S. Mortgage Bankers. Christopher Albert is Brian Albert's brother and Kamel and Elizabeth Albert's son.
[12] Mr. Ray testified that he remembers attending only one closing to sign the paperwork for both properties. (Trial Tr. vol. 1, 52:19-21 (Ray)).
[13] Masterhost was owned by Christopher Albert, who, as noted previously, is related to the property sellers.

give PTS any reason to believe that there was a connection between Masterhost and himself. (Trial Tr. vol. 1, 53:13-21 (Ray)). Although Mr. Ray was to pay the $72,429.06 from his own funds at closing to buy the properties, he provided no funds at all, contrary to the Closing Instructions that listed the "loan-to-value" rate [14] of 90% for Mr. Ray's Loans. He testified that he never intended to make any down payment and would not have purchased the property if he had to use his own money. *Id.* at 53:10-12.

The same day that Mr. Ray signed the closing documents, he met with and received the keys to the properties from Craig Turturo. *Id.* 52:8-15.

**B.   *Mr. Ray's Default on the Mortgage Loans***

Mr. Ray defaulted on the Unit 206 and Unit 308 mortgages on November 1, 2007. Old Bank commenced foreclosure proceedings against Unit 206 in June 2008. New Bank[15] obtained a decree of foreclosure finding in June 2009 and obtained title to Unit 206 in a foreclosure sale in August 2009. New Bank sold the property for $85,029.49 and received $71,361.74 from the sale in January 2010. The unpaid principal balance was $278,904.90, unpaid interest was $38,917.70, and the taxes, insurance, and other expenses amounted to $19,589.80.[16]

In April 2008, Old Bank initiated foreclosure proceedings against Unit 308. It received a finding that it had the first priority mortgage in October 2008. Old Bank received title in a

---

[14] The "loan-to-value" rate compares the amount of the loan to the value of the property. Mr. Ray's loan-to-value of 90% entitled him to a loan equaling no more than 90% of the value of the property. With a sales contract price of $305,000 for each unit, Mr. Ray had to pay at least $30,500, as down payment with his own funds, to comply with the 90% loan-to-value rate.

[15] Old Bank closed in May 2009 and the FDIC was appointed its receiver. The FDIC entered into a Purchase and Assumption Agreement and Loss Share Agreement ("P&A Agreement") with BankUnited ("New Bank") on May 21, 2009. (*See* P&A Agreement, Trial Exh. D2-80). Under the P&A Agreement, the FDIC paid New Bank $4 billion to accept Old Bank's loans as a unit, including the Loans at issue in this matter, other assets, and liabilities. (*See* Trial Tr. vol. 2, 63:2-15 (Newbold)).

[16] These amounts reflect the FDIC's updated principal and interest amount, which it modified to reflect the Loans' adjustable interest rates. (*See* Trial Tr. vol. 1, 232:22-233:1 (Newbold)).

foreclosure sale in November 2008. In March 2009, Old Bank received a $79,012.82 check in connection with a private mortgage insurance claim caused by the Borrower's default on the Unit 308 loan. New Bank sold the property in September 2009 for $90,000 and received $72,762.29 in the sale. The unpaid principal balance was $278,904.90, unpaid interest was $25,468.15, and the taxes, insurance, and other expenses amounted to $3,774.31.

### C.   *Notice and Filing of Lawsuit*

The FDIC issued an administrative subpoena upon PTS on March 15, 2012 requesting that PTS produce all its documents relating to the Ray Loans. PTS produced the requested documents on April 11, 2012. The FDIC submitted a claim to First American under the CPLs on April 19, 2012. The FDIC filed the instant lawsuit on May 17, 2012, after First American had not responded to the FDIC's claim. The FDIC's Complaint alleges two counts for each of the Loans of breach of contract (Counts I and V), breach of fiduciary duty (Counts II and VI), and negligent misrepresentation (Counts III and VII) against PTS and two counts of breach of contract (Count IV and VIII) against First American for the two Loans.[17]

The FDIC contends that PTS's failure to follow Old Bank's Closing Instructions for the Ray Loans and PTS's dishonesty resulted in damage to Old Bank. Because of PTS's conduct, First American is required to indemnify the FDIC, as Old Bank's receiver, in accordance with the CPLs. The FDIC alleges that it has standing to assert the CPL claims against First American and that First American breached its contractual obligations by refusing to reimburse the FDIC for its loss. The FDIC is seeking damages.

---

[17] As previously explained, *see supra* note 4, PTS and the FDIC reached a settlement on the breach of contract (Counts I and V), breach of fiduciary duty (Counts II and VI), and negligent misrepresentation (Counts III and VII) claims against PTS in this matter. Therefore, I need only address Counts IV and VIII, the two breach of contract claims against First American.

First American alleges that the FDIC is barred from bringing its claims because: (1) the FDIC does not have standing to assert the claims under the CPL; (2) its action is barred by the CPL's 90-day notice provision;[18] and (3) the violation of the Closing Instructions alleged do not fall within any of the specifically defined scenarios listed in the CPLs. Furthermore, First American contends that any loss suffered by Old Bank is not attributable to any misconduct on the part of PTS, and that not enough evidence exists to calculate any damages.

## II.   LEGAL ANALYSIS

### A.   *Standing*

First American argues that the FDIC does not have standing to assert a CPL claim because: (1) the rights offered by the CPLs run with the land and the FDIC no longer holds the mortgages; (2) even if the CPLs' protections did not run with the land, the FDIC did not retain those rights in its P&A Agreement with New Bank; and (3) even if the FDIC retained its CPL rights, its claims are time-barred because it did not provide notice within the ninety days required by the CPLs. The FDIC argues that: (1) the CPLs' language does not require the FDIC to hold the Loans to bring a claim; (2) under Section 3.5 of the P&A Agreement,[19] it successfully carved

---

[18] First American argues that the CPLs bar recovery unless it receives written notice of a loss within ninety days from the date of discovery of such loss. Under the 90-day notice provision of the CPLs as provided in paragraph D,

> Claims of loss shall be made promptly to [First American . . . .] When the failure to give prompt notice shall prejudice [First American] liability of the First American Title Insurance Company hereunder shall be reduced to the extent of such prejudice. [First American] shall not be liable hereunder unless notice of loss in writing is received by [First American] within ninety (90) days from the date of discovery of such loss.

(CPL dated Apr. 30, 2007, Trial Exh. J-57 at 2, J-58 at 2).

[19] Section 3.5 reads, in pertinent part:

out and retained its CPL rights after the Loan transfers; and (3) the FDIC complied with the CPL's 90-day notice provision.

      To determine whether the FDIC has standing to bring its claims against First American, I must interpret the CPLs and P&A Agreement's language.  In construing the language of a contract, courts must look to the plain meaning and may only consider extrinsic evidence when the language is ambiguous.  "[W]here the essential terms of a contract are unambiguous the court will not look beyond the four corners of the document to determine the parties intent.'" *See Ellinger v. United States*, 470 F.3d 1325, 1338 (11th Cir. 2006) (internal quotation marks omitted); *see also Taylor v. Taylor*, 1 So. 3d 348, 350 (Fla. 1st Dist. Ct. App. 2009) (citing *Royal Oak Landing Homeowner's Ass'n, Inc. v. Pelletier*, 620 So.2d 786, 788 (Fla. 4th Dist. Ct. App. 1993)) ("Contract interpretation begins with a review of the plain language of the agreement because the contract language is the best evidence of the parties intent at the time of the

---

      **Assets Not Purchased by Assuming Bank**. The Assuming Bank does not purchase, acquire or assume, or (except as otherwise expressly provided in this Agreement) obtain an option to purchase, acquire or assume under this Agreement: . . .

            (b) any interest, right, action, claim, or judgment against . . . (i) . . . [any] Person . . . retained by the Failed Bank . . . arising out of any act or omission of such Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other insurance policy of the Failed Bank, . . . or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank; *provided*, *that* for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered and regardless of whether any such claim is made with respect to a financial institution bond, banker's blanket bond, or any other insurance policy of the Failed Bank in force as of Bank Closing.

(P&A Agreement, Trial Exh. D2-80 at 13-14) (emphasis in original).

execution of the contract."). Therefore, I will assess the plain meaning of the CPLs and P&A Agreement's language to determine the FDIC's standing in the instant matter.

(1)     *Standing under the CPLs*

First American claims that the CPL's language requires that the party seeking reimbursement hold the mortgage secured by an interest in land when filing the CPL claims; its argument rests on the belief that the CPL contractual rights "run with the interest in the land." First American contends that once the FDIC transferred the Loans to New Bank, the FDIC lost its standing to bring a CPL claim. The FDIC argues that the CPLs do not contain a requirement that a claimant retain its interest in the land secured by a mortgage in order to bring a CPL claim and that it retained its CPL rights through the carve-out provision in the P&A Agreement.

The CPLs are an agreement between the title insurance underwriter and the lender that the lender may rely on to ensure it will be reimbursed for the misconduct of the title insurance underwriter's agent during the closing. *See Fito v. Attorney's Title Ins. Fund, Inc.*, 83 So. 3d 755, 757 n.2 (Fla. 3d Dist. Ct. App. 2011). Pursuant to the CPLs addressed to Old Bank and "ISAOA," meaning "Its Successors And/Or Assigns,"

> When title insurance of First American . . . is specified for your protection in connection with closings of real estate transactions in which you are to be . . . a lender secured by a mortgage . . . of an interest in land, . . . First American . . . hereby agrees to reimburse you for actual loss incurred by you in connection with such closings when conducted by [PTS], when such loss arises out of' PTS's failure to comply with Old Bank's Closing Instructions[20] or PTS's fraud or dishonesty in handling Old Bank's funds or documents in connection with the closing.

---

[20] PTS's failure to comply with the Closing Instructions must relate to: (1) the status of the title or validity, enforceability, and priority of the lien; (2) obtaining of documents specifically required by Old Bank; or (3) the collection and payment of funds due to Old Bank. (CPL dated Apr. 30, 2007, Trial Exh. J-57 at 1, J-58 at 1).

(CPL dated Apr. 30, 2007, Trial Exh. J-57 at 1, J-58 at 1).  Under the plain reading of the CPL, only a party who: (1) will be receiving title insurance from First American in connection with a closing; (2) will be a lender of a mortgage secured by an interest in land; and (3) will have PTS as its closing agent will obtain CPL contractual rights and will be reimbursed for losses in connection with the acts of the closing agent.  When First American issued the CPLs, Old Bank: (1) was to receive title insurance from First American in connection with the Unit 206 and 308 closings; (2) would become a lender secured by a mortgage of an interest in land; and (3) would have PTS as its closing agent.  If PTS failed to comply with the Closing Instructions or committed fraud or dishonesty during the closings, First American would reimburse Old Bank. The CPLs' emphasis is on the closing and PTS's participation during the closing.

The purpose of language regarding "a lender secured by a mortgage . . . of an interest in land" is to describe the party receiving the indemnification protection, i.e., one who will be receiving an interest in land.  It does not impose a requirement that the party with a CPL contractual right continue to hold that interest in order to submit a CPL claim, and it does not state that the party's rights are extinguished upon transfer of the mortgage.  To read the CPL's language as requiring the claimant to hold the interest in the land would require the Court to insert a limitation where the language of the CPL does not require doing so.

By way of comparison, I reviewed the language of the Title Insurance Policy ("Policy") First American issued to Old Bank.  (First American's Lender Policy, Trial Exh. D2-42, D2-56). The Policy provides that First American "insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained" because of the invalidity or unenforceability of the lien and loss of priority of the lien.  *Id.* at FDIC002081.  By using the present tense, the quoted language demonstrates that the Policy only covers the owner of the loan secured by a

mortgage in an interest in land.  Under the plain reading of the Policy, it would be difficult for a potential claimant to argue, without more, that it retained the Policy's protections after it transferred a loan associated with the Policy to another party.  However, the CPLs at issue in this matter do not contain that narrowing language.  Instead, it promises to indemnify a future lender secured by a mortgage of an interest in land.

First American claims that only New Bank would have a right to file a CPL claim, even though the FDIC and New Bank agreed that the FDIC would retain that right through their P&A Agreement carve-out.  In *JPMorgan Chase Bank, N.A. v. First Am. Title Ins. Co.*, 795 F.Supp.2d 624 (E.D. Mich. 2011) (hereinafter, "*Chase*"), the court had to determine the same question presented here: whether the FDIC had standing to pursue its CPL claims under a similar "carve-out" provision.  The court found that the FDIC, as the appointed receiver, had retained its CPL contractual rights via the carve-out after it sold the loan and title insurance policy and did have standing to bring a CPL claim.  The court reviewed the language of the CPL to find that: (1) the FDIC stepped into the original mortgage holder's "shoes by operation of law and acquired the former holder's rights under the CPL; (2) [t]here [was] no provision in the CPL [that] provide[d] that the original holder would lose its indemnification rights if it subsequently sold" the loan; and (3) the "FDIC did not forfeit [the original holder's] protections under the CPL."  *Chase*, 795 F.Supp.2d at 631.

I find the *Chase* court's findings applicable to the situation presented here.  First American issued the CPLs to Old Bank and its successors and assigns.  The FDIC stepped into Old Bank's shoes as receiver and acquired Old Bank's CPL rights.  The CPLs do not state that Old Bank would lose its indemnification rights if it transferred or sold the Loans.  Therefore, the

FDIC did not forfeit Old Bank's CPL protections when it transferred the Loans to New Bank and the FDIC continues to hold those indemnification rights.

The CPL's language does not support First American's interpretation that the CPL runs with the interest in the land. Therefore, I find that the CPLs do not impose a requirement that a claimant retain its mortgage in order to bring CPL claims and that the FDIC, as Old Bank's receiver, has standing to bring a claim under the language of the CPLs.[21]

     (2)    *Standing under the P&A Agreement*

First American next claims that even if the FDIC did not forfeit its CPL rights by selling the Loans, it lost the right to bring a CPL claim under the terms of its P&A Agreement with New Bank. The FDIC disagrees and contends that it successfully preserved its rights under the CPL through the P&A Agreement's carve-out provision.

First American provides no legal basis that establishes how it, a non-party to the P&A Agreement, can permissibly interpret the terms of that agreement. First American is not an intended third-party beneficiary of the P&A Agreement; therefore, it has no standing to challenge the interpretation of that Agreement. *See Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 934 (11th Cir. 2013) (finding that a third party to a P&A Agreement between the FDIC and a new bank did not have standing to enforce its interpretation of that agreement).

---

[21] In support of its argument that the FDIC lacks standing, First American cites to the findings in a Report and Recommendation ("R&R") for the case of *FDIC as Receiver for BankUnited, FSB v. Floridian Title Group, Inc., and First Am. Title Ins. Co.*, No. 12-cv-21890, DE 125 (S.D. Fla. July 24, 2013) (hereinafter, "*Floridian Title*"). Citing to *Wall Street Mortgage Bankers, Ltd. v. Attorneys' Title Insurance Fund, Inc.*, No. 08-cv-21648, (S.D. Fla. Sept. 9, 2009), the court in *Floridian Title* found that the CPL ran with the interest in land, and that this "render[ed] the FDIC's carve-out futile." *Floridian Title*, No. 12-cv-21890, slip op. at 16, DE 125 (S.D. Fla. July 24, 2013). Chief Judge Federico A. Moreno issued an Order adopting the R&R on September 23, 2013. *See id.* at DE 157. For the reasons stated above, I disagree with the *Floridian Title* court's findings.

Assuming, *arguendo*, that First American does have standing to interpret the P&A Agreement's terms, I will review the language in Section 3.5(b) of the Agreement to determine whether the FDIC preserved its CPL contractual rights. Section 3.5(b) authorized the FDIC to retain any interest, right, action, claim, or judgment against certain individuals and entities, including:

> (i) . . . [any] Person[22] . . . retained by the Failed Bank . . . arising out of any act or omission of such Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other insurance policy of the Failed Bank, . . . or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank.

(P&A Agreement, Trial Exh. D2-80 at 13-14). The acts, omissions, or other events giving rise to any such claim must have occurred before the closing of the bank. *Id*. at 14.

As to Subsection 3.5(b)(i) of the P&A Agreement, Old Bank retained First American to provide title insurance and indemnify Old Bank for PTS's conduct during the Ray closings. The FDIC contends that PTS's actions resulted in actual loss and that it brought these claims against First American because of those actions. Subsection 3.5(b)(i) does not contain a requirement that the claim be limited to direct claims or that the act committed by an agent does not apply to this section and I refuse to read such a limitation here. Therefore, the FDIC has standing under Subsection 3.5(b)(i) of the P&A Agreement.

In interpreting Subsection 3.5(b)(ii) of the P&A Agreement, First American would like the Court to read the provision restrictively. Even though the plain meaning of the Subsection explicitly states that the FDIC retained its claims against an underwriter of an insurance policy of

---

[22] The P&A Agreement defines a "person" as "any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof, excluding the Corporation." (P&A Agreement, Trial Exh. D2-80 at 6).

Old Bank generally, First American asks the Court to construe the provision to require that the claims relate to the insurance policy only.  First American admits that it was an underwriter of the title insurance policies in the Ray transactions and that it issued the CPLs under its role as title insurer.  However, First American argues that Subsection 3.5(b)(ii) does not apply in the instant matter because the FDIC no longer holds the title insurance and because the FDIC is not suing First American as an underwriter.  The Subsection does not include such restrictions; it identifies the parties, underwriters of insurance policies, against whom the FDIC continues to hold the right to file a claim.  Therefore, First American is an underwriter of an insurance policy, Subsection 3.5(b)(ii) applies, and the FDIC has standing.

Lastly, Subsection 3.5(b)(iii) appears to be a catchall provision that authorizes the FDIC to preserve its claims against any party whose actions resulted in a loss to Old Bank.  The FDIC alleges that PTS's actions caused it an actual loss and the FDIC is suing First American for reimbursement of that loss under the CPLs.  Since the instant suit is undoubtedly related to a loss incurred by Old Bank, I find that the FDIC has standing to bring the instant action under Subsection 3.5(b)(iii) of the P&A Agreement.

First American contends that notwithstanding the fact that Subsection 3.5(b)(i), (ii), and (iii) apply to the instant matter, Section 3.5(b)'s requirement that the acts, omissions, or other events giving rise to any such claim must have occurred before the closing of Old Bank bars the FDIC from bringing its CPL claims in the instant matter.  It asks the Court to find that no acts or events occurred prior to Old Bank's failure since the FDIC is suing First American on a breach of contract claim and the acts that brought about such a claim did not occur until after Old Bank closed its doors.

I disagree with First American's contention that no acts or events occurred prior to Old Bank's failure.  As the FDIC notes, and I agree, there is a difference between the FDIC's indemnity rights under the CPLs, and First American's breach of its requirement to indemnify the FDIC.  As discussed previously, the CPLs issued by First American in April 2007 gave Old Bank a right of indemnification because Old Bank was to become a lender secured by a mortgage on Mr. Ray's properties, it was to receive title insurance protection from First American, and PTS was to be the closing agent for the sales transactions.  Old Bank met these conditions in May 2007 and it had a right of indemnification at that point.  In other words, Old Bank and First American entered into an indemnification contract before Old Bank failed.  The FDIC retained Old Bank's indemnification rights under the P&A Agreement carve-out.  Once the FDIC determined that it had a claim under the CPLs, it notified First American.  Even though the instant suit arose in May 2012, when First American first refused to indemnify the FDIC, the events establishing those rights occurred in May of 2007.

Since the issuance of the CPLs occurred prior to Old Bank closing its doors, the acts that gave rise to the FDIC's CPL claims were committed before Old Bank's failure as well.  The FDIC, stepping in Old Bank's shoes as receiver, retained that contractual right even after it transferred the Loans to New Bank.  I find that FDIC preserved its CPL's contractual rights to assert a claim against First American under Section 3.5(b) of the P&A Agreement.

(3)     *Notice under the CPL*

First American next asserts that even if FDIC did preserve its CPL rights, it has not met its burden of proving compliance with the 90-day notice provision.  The FDIC argues that it abided by the 90-day notice provision of the CPL.  Paragraph D of the CPLs provides:

> Claims of loss shall be made promptly to [First American . . . .]  When the failure
> to give prompt notice shall prejudice [First American] liability of the First

American Title Insurance Company hereunder shall be reduced to the extent of such prejudice. [First American] shall not be liable hereunder unless notice of loss in writing is received by [First American] within ninety (90) days from the date of discovery of such loss.

(CPL dated Apr. 30, 2007, Trial Exh. J-57 at 2, J-58 at 2).   In the context of CPLs, the "discovery of loss" must encompass not only the discovery of an actual loss, but also the discovery of facts which give rise to a claim covered by the CPLs.[23]   The 90-day notice period does not start until the party asserting a CPL claim has knowledge of specific acts giving rise to the claim.  *See Floridian Title*, No. 12-cv-21890, slip op. at 19 (S.D. Fla. July 24, 2013) (citing to *FDIC v. Attorneys' Title Ins. Fund*, No. 10-cv-21197, slip op. at 11 (S.D. Fla. May 17, 2011) (hereafter, "*Attorneys' Title*").   Once the party with the contractual rights under the CPL obtains the requisite knowledge, it must notify the issuer promptly within ninety days.

Additionally, First American alleges that Sean Newbold ("Newbold"), the FDIC's designated Federal Rule of Civil Procedure 30(b)(6) witness, did not have personal knowledge of when the FDIC first discovered the CPL claim and, therefore, the FDIC failed to show it met the 90-day notice provision.   The FDIC first received the documents regarding the Ray sales transactions from PTS on April 11, 2012 in response to the FDIC's March 12, 2012 subpoena dues tecum.  (*See* PTS's Responses to Subpoena Dues Tecum to FDIC, Trial Exh. P-70).   These documents provided the FDIC with the specific acts necessary to establish its claims and triggered the commencement of the 90-day notice period.   Before obtaining these specific documents, the FDIC could not have discovered that the wire transfer did not come from Mr. Ray, but had come from Masterhost, and the other information regarding the mortgage fraud

---

[23] I analyzed the requirements of the CPL's 90-day notice provision in detail in my previously issued Order on Defendant First American's Motion for Summary Judgment. (*See* DE 136 at 9-12 (May 15, 2013)).  I find it unnecessary to address what triggers the provision again and I decline to do so here.

scheme. The FDIC submitted its claim to First American eight days later. (*See* Correspondence from Mortgage Recovery Law Group, Trial Exh. J-52). I find the FDIC's notice was timely and prompt.[24]

The FDIC has introduced sufficient evidence to show that the documents it received from PTS through the administrative subpoena provided it with the specific facts needed to discover and to allege mortgage fraud. (*See* Trial Tr. vol. 1: 222:3-8 (Newbold); Trial Tr. vol. 2, 15:17-19 (Newbold)).

### B.   *Breach of Contract*

Finding that the FDIC does have standing to bring CPL claims against First American, I must now determine whether First American breached the CPLs by refusing to reimburse the FDIC. The elements of an action for breach of contract are: (1) the existence of a contract; (2) a breach of the contract; and (3) damages resulting from the breach. *Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. 2d Dist. Ct. App. 2006) (citing *Knowles v. C.I.T. Corp.*, 346 So.2d 1042, 1043 (Fla. 1st Dist. Ct. App. 1977)). While the Parties do not dispute that the CPLs are valid contracts, they disagree as to whether First American breached the contracts, and whether Old Bank's damages flowed from the breach.

In order to determine whether First American breached the CPLs, I must first determine whether PTS's actions triggered First American's indemnification obligation under the CPLs. First American's obligation arises out of:

> 1. Failure of [PTS] to comply with [Old Bank's] written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds

---

[24] The issue of prejudice to First American only arises in determining whether it was notified of the claim promptly within the ninety days. As I find notice was prompt, determining whether First American was prejudiced is unnecessary and I decline to do so here.

necessary to establish such status of title or lien, or (b) the obtaining of any other document, specifically required by [Old Bank], but not to the extent that said instructions require a determination of the validity, enforceability or effectiveness of such other document, or (c) the collection and payment of funds due [Old Bank], or

2. Fraud or dishonesty of [PTS] in handling [Old Bank's] funds or documents in connection with such closing.

(CPL dated Apr. 30, 2007, Trial Exh. J-57 at 1, J-58 at 1). If I find that PTS failed to comply with the Closing Instructions or that it committed dishonesty, then I must next determine whether that misconduct caused FDIC's actual losses.

    (1)    *Closing Instructions*

The FDIC contends that PTS's failure to comply with the Closing Instructions as they relate to the enforceability of the lien caused an actual loss for which First American must reimburse the FDIC. First American argues that it does not have to indemnify the FDIC because: (1) PTS followed its duties under the Closing Instructions, and (2) even if PTS failed to comply with the Closing Instructions, PTS's actions did not affect the enforceability of the lien since New Bank was able to foreclose on the Loans.

    (a)    Compliance with the Closing Instructions

I note at the onset that a closing agent owes a fiduciary duty to the parties involved in the sales transactions, absent an express agreement. *The Florida Bar v. Joy*, 679 So.2d 1165, 1167 (Fla 1996). Consistent with this duty, a closing agent "has a duty to supervise the closing in a reasonably prudent manner." *The Florida Bar v. Hines*, 39 So. 3d 1196, 1200 (Fla. 2010) (quoting *Askew v. Allstate Title & Abstract Co.*, 603 So. 2d 29, 31 (Fla. 2d Dist. Ct. App. 1992) (internal quotation marks omitted)). In addition, a closing agent must inform its principal of all material facts relevant to the transaction. *See Sudbury v. Lowke*, 403 So. 2d 1117, 1119 (Fla. 5th Dist. Ct. App. 1981) (citations omitted).

PTS agreed to abide by the Closing Instructions.  Under the Instructions, the closing agent was required to notify Old Bank of "any deficiencies or discrepancies with [the] closing instructions or closing documents."  (Closing Instructions, Trial Exh. J-17 at 1, J-23 at 1). Moreover, the Closing Instructions specifically stated, "It is the responsibility of the closing agent to verify that ALL closing documents have been properly prepared, executed and dated." *Id.* at 5 (emphasis in original).  Under the HUD-1 section of the Closing Instructions, "NO CREDITS [WERE] ALLOWED to be paid on behalf of borrower(s) without prior authorization from" Old Bank.  (Closing Instructions, Trial Exh. J-17 at 2, J-23 at 2) (emphasis in original). Furthermore, the Closing Instructions stated that Mr. Ray's loan-to-value of 90% entitled him to a loan equaling no more than 90% of the value of the property.  This instruction meant that with a sales contract price of $305,000 for each unit, Mr. Ray had to pay at least $30,500, as down payment with his own funds.[25]  The closing agent had a responsibility to review the closing documents and the wire transfer she received as down payment for the sale transactions to determine whether the borrower had abided by the bank's terms.

PTS did not comply with its fiduciary duties as a closing agent, and it did not follow Old Bank's Closing Instructions.  In violation of the HUD-1s certified by the PTS closing agents and the Closing Instructions, Mr. Ray did not actually provide any funds for either sales transaction. Instead, Masterhost, a company owned by Christopher Albert, the son and brother of the property sellers, provided the down payment "for Ray's benefit."  PTS failed to verify who sent the money on Mr. Ray's behalf.  As a result, Old Bank funded two loans at more than 90% financing in violation of the Closing Instructions.

---

[25] After fees and other costs, Mr. Ray was to pay a total of $72,429.06.

Under the terms of the Closing Instructions, PTS could not simply signoff that the documents were executed without reviewing them for discrepancies. The Closing Instructions charged PTS with ensuring that the closing documents, including the HUD-1s, were accurate. PTS did not do so, and therefore, it failed to comply with the Closing Instructions.

(b)     Enforceability

First American argues that because New Bank was able to foreclose on the Loans, PTS's actions did not affect the enforceability of the lien. The FDIC contends that the CPLs' language regarding the enforceability of the lien encompasses more than its ability to foreclose on the Loans since Old Bank received title insurance to address that risk.

Courts have recognized that the title insurance policies and CPLs cover entirely different categories of loss. In one instance, a court stated that CPLs have "nothing to do with title defects." *Chase*, 795 F.Supp.2d at 630. In another, a Florida court acknowledged the difference by finding that a buyer could not sue the insurer for breach of contract under the title insurance, as written, but he could sue the insurer under breach of its duties as closing agent. *See Phrazer Co., Inc. v. Lawyers Title Ins. Corp.*, 508 So. 2d 731 (Fla. 5th Dist. Ct. App. 1987). In *Phrazer*, the buyer obtained access from his property to the highway as required under the title insurance policy, but the buyer did not obtain the preferred direct access. The *Phrazer* court remanded the matter to allow the buyer to amend his complaint to sue the closing agent-insurer since the closing agent-insurer was aware of the buyer's desire to obtain direct access. Although the title insurance policy did not require direct access to the highway, the court found that the buyer could allege the closing agent breached its closing duties. Title insurance addresses, in pertinent part, the ability to foreclose on the property; the CPL relates to the closing agent's conduct during the closing and how the closing agent's conduct affects a mortgage holder's ability to

obtain what it bargained for.  Since the closing and the title insurance instructions offer different and separate protections, First American's contention that the successful foreclosures on the property demonstrates that PTS's conduct did not impact the enforceability of the lien is misguided.

In *Walsh v. Securities, Inc. v. Cristo Property Management, Ltd.*, 858 F.Supp.2d 402, 419 (2012), the court found that a lender had coverage under the CPLs for fraudulent mortgage loans because of the closing attorneys' participation in a fraudulent scheme that affected the loans' validity and enforceability.  Similar to the present matter, the named buyers were not bona fide purchasers and the buyers did not provide any down payment or secondary financing.  The closing attorneys sought straw buyers to apply for the loans and worked exclusively with the same assistant to complete the fraudulent transactions.  Once the closing documents were submitted to the lender, the closing attorneys transferred the loan proceeds to themselves and their co-conspirators.  *Id.* at 409.

The *Walsh* court explained that a lender has a reasonable expectation that a title insurance policy will insure: "(1) that the borrower is a bona fide mortgage with the financial capacity to make the mortgage payments; (2) that the mortgage is a first-lien on the property subject to foreclosure, if necessary; and (3) the right to seek recovery of a deficiency after foreclosure from the mortgagor."  *Id.* at 418-19.  When the closing attorneys' conduct affects any of these reasonable expectations and causes a loss to the lender, CPL coverage is available, even when the lender is able to foreclose on the property.  Since the lender in *Walsh* was deprived of a borrower who was a bona fide purchaser in each sales transaction because of the closing attorneys' actions, the lender had standing to bring a suit under the CPLs.

In another case where a party presented an argument similar to First American's argument, the court noted that this argument was "an implausibly short-sighted assessment of the circumstances underlying [the] transaction." *Fifth Third Mortg. Co. v. Kaufman*, No. 12 C 4693, 2013 WL 474506, at *3 (N.D. Ill. Feb. 7, 2013) (hereinafter, "*Fifth Third*"). The *Fifth Third* court analyzed a CPL with similar language to the present matter and found that the closing agent's misconduct resulted in the mortgage servicer entering into a mortgage agreement without a bona fide borrower. *Id.* In *Fifth Third*, the seller's attorney in two of the three loans owned and managed the company that served as the closing agent in all three loans. The title insurance company that hired the closing agent issued a CPL to the mortgage servicer that required indemnification for loss associated with the closing agent's failure to abide by the closing instructions related to the "collection and payment of funds due" to the mortgage servicer.[26] The mortgage servicer alleged that the seller, the seller's attorney, the closing agent, and others paid young women to act as straw buyers for various residential property sales, in a short period of time, before the straw buyers' buying histories was discovered. The *Fifth Third* court found that even though the mortgage servicer was successful in foreclosing on the properties, it did not get what it bargained for: a bona fide borrower. The scheme was set up to guarantee an immediate default. The *Fifth Third* court held that "the sham-nature of the bargain cannot be excused or ignored simply because one of the remedies that would have been available to [the mortgage servicer] had the transaction been legitimate remained available to" the mortgage servicer despite the scheme. *Id.*

---

[26] Although the *Fifth Third* court examined the CPL provision regarding the "collection and payment of funds due" to the mortgage servicer, its findings apply directly to the enforceability of the lien of the mortgage as well.

As in *Walsh* and *Third Fifth*, Old Bank's reasonable expectation was that it would have: (1) a bona fide mortgagor with the capacity to make mortgage payments; (2) a valid first lien on the property; and (3) the right to seek recovery of a deficiency after foreclosure from the mortgagor. Mr. Ray, the straw buyer, provided no down payment. Since he would not lose any of his own money by defaulting, Mr. Ray had no incentive to pay his mortgages and, in fact, did default on the Loans after only four payments. Without a bona fide mortgagor, the scheme was set up to guarantee a default. PTS's conduct during the closing caused Old Bank to obtain two mortgages without a bona fide mortgagor, and to provide funds to members of a mortgage fraud scheme. Therefore, Old Bank did not receive the bona fide mortgagor for which it bargained and PTS's failure during the closings affected the enforceability of the liens under the CPLs.

     (2)    *Dishonesty*

The FDIC also claims that PTS's handling of the closing documents submitted to Old Bank amounts to dishonesty. First American contends that the FDIC has not proven this point.

The CPL does not provide a clear definition of "dishonesty." Therefore, I have looked to other types of suits to define the word as used in the CPLs. For example, in a fidelity bond case cited by the FDIC, *Miami Nat'l Bank v. Pa. Ins. Co.*, 314 F.Supp. 858 (1970) (hereinafter, "*Miami National*"), the court found that the terms "dishonesty" and "fraudulent" "'include acts which show a want of integrity or breach of trust.' Acts, or a course of conduct, demonstrating an intentional breach of trust or a reckless disregard for the interests of the employer would establish 'fraudulent' or 'dishonest' conduct." 314 F.Supp. at 862 (quoting *Arlington Trust Co. v. Hawkeye-Security Ins. Co.*, 301 F.Supp. 854, 857-58 (E.D. Va. 1969). In *Miami National*, a bank sued its sureties to recover damages under two fidelity bonds that promised indemnification for "any loss through any dishonest, fraudulent or criminal act of any of the employees." *Id.* at

860.   The bank alleged that its employee permitted a bank customer to obtain loans that surpassed the bank's authorized limit and allowed the customer to list the names of other individuals as borrowers to avoid detection.  The court found that the bank employee's action constituted fraud or dishonesty within the meaning of the fidelity bonds because of: (1) the bank employee's relationship with the customer's principal officers; (2) his control of the loan department; (3) the highly irregular procedures he employed; and (4) his deliberate circumvention of the loan limit.  *Id.* at 862-63.  The bank employee's conduct demonstrated that he made unauthorized loans to the bank customer in circumstances showing reckless disregard for the bank's interests.  *Id.* at 863.

First American cites to the Florida Supreme Court's standard of dishonesty in the context of attorney misconduct for a definition of dishonesty.  In *The Florida Bar v. Head*, 84 So. 3d 292 (Fla. 2012) (hereinafter, "*Head*"), the Florida Supreme Court found that an attorney lied in an affidavit he submitted to the court and used a fake case number in a letter to indicate his client had begun court proceedings against a tenant, when in fact no such proceedings had been filed. Because of these actions, the court held that the attorney had acted with such intent to constitute dishonest conduct.   In arriving at its finding, the Florida Supreme Court analyzed the rule banning a lawyer from engaging in "conduct involving dishonesty, fraud, deceit, or misrepresentation," R. Reg. Fla. Bar 4-8.4(c), and stated that dishonesty requires a showing of intent.  *Head*, 84 So. 3d at 300.  However, the court in *Head* explained that this requirement could be met merely by showing that an individual acted deliberately or knowingly.  *Id.* (citing *Fla. Bar v. Smith*, 866 So. 2d 41, 46 (Fla. 2004) (recognizing that the motive behind the attorney's action was not the determinative factor but instead the issue was "whether the attorney deliberately or knowingly engaged in the activity in question")).  To act "deliberately" would

24

include "willful blindness," i.e. conduct indicating that an individual deliberately closed her eyes to the existence of facts that would otherwise be obvious to her.[27]

While these definitions of "dishonesty" under fidelity bonds and the ethical rules for attorney fiduciaries have arisen in circumstances other than CPLs, the analogies provide an understanding of dishonesty that I find relevant and applicable. I therefore conclude that in analyzing the language of the CPLs, dishonesty requires a showing of intent. This requirement may be met by showing that an individual acted deliberately, knowingly, willfully blind of facts that would otherwise be obvious, or with reckless disregard for her duties as closing agent during the closing. It is with this standard of "dishonesty" that I review the facts in the instant matter.

Although circumstantial, I find a preponderance of the evidence indicates Ms. Bensema not only facilitated the scheme, but also was complicit in it. This was a classic mortgage fraud scheme. Mr. Ray was a straw buyer. He did not negotiate the prices, he did not negotiate the terms of the mortgage, he had little familiarity with the property, and he did not put any money into the transaction. He claimed to make over twice his real income on his mortgage application. Mr. Ray had no realtor, at least not in any traditional sense of the word. Craig Turturo, who claimed he was simply helping out a fellow firefighter, but who was the son of the man who selected PTS and the brother of the appraiser of the properties, testified falsely concerning his involvement in the case.

---

[27] The Florida Supreme Court has held that attorney fiduciaries may not raise ignorance as a defense when accused of dishonest conduct. *See The Fla. Bar v. Terry*, 333 So. 2d 24 (Fla. 1976) (finding attorney fiduciary's ignorance defense inadequate because his role as a fiduciary for an incompetent required him to obtain the knowledge necessary to fulfill his duties). From the Florida Supreme Court's holding, it would make sense that when facts indicate that the individual chose not to learn the information necessary to abide by her fiduciary duties and remained willfully ignorant, the intent necessary to show dishonest conduct exists.

The closing agent was the gatekeeper for these transactions and the circumstances of these transactions point towards complicity on the part of PTS. Commonsense tells us that participants in mortgage fraud do not select closing agents who are likely to ask questions and PTS certainly fulfilled that expectation in this scheme. Mr. Ray testified that he received no correspondence whatsoever from anyone at PTS regarding the closing, or instructions for the down payment. He simply showed up on the closing date, signed the closing documents, and left. No one asked him about a down payment, though it was an important part of the transactions. He did not receive the keys until later that day and then he got them from Craig Turturo, who claimed to have no role in the transaction, but who had sent an email to Ms. Bensema reminding her about adding a commission to the HUD-1 forms. (Trial Exh. P-144). Craig Turturo's testimony that he did not know why Ms. Bensema sent him a copy of the HUD-1s and did not remember why he was asking her to make changes on the HUD-1s was not credible. (Trial Tr. vol. 1, 88:1-91:7). It was apparent to me, throughout his testimony, that he was lying about his involvement in the transactions. These events reflect a plan by Craig Turturo, Mr. Ray, and the property sellers to commit mortgage fraud with Ms. Bensema's help.

Ms. Bensema was responsible for preparing for and overseeing the closing, yet she admitted that there were no documents showing she contacted Mr. Ray regarding the closing. The closing files contain none of the documents that would ordinarily be expected, such as communications with the buyer or realtors. After reviewing the evidence in this case, even First American's expert witness, Jerry Aron, testified that the HUD-1s PTS prepared for the closing did not accurately reflect the transactions in dispute. (*See* Trial Tr. vol. 2, 262:25 – 263:6 (Aron)). Ms. Bensema knowingly signed off on the inaccurate HUD-1 of the first sale even though PTS had not received any down payment from Mr. Ray. Ms. Bensema did not notify Old

Bank, as was her continuing duty, that the money did not come from Mr. Ray. Ms. Bensema knew of a clear "discrepancy" with regard to the HUD-1s she submitted to Old Bank. (Closing Instructions, Trial Exh. J-17 at 1, J-23 at 1).

Ms. Bensema was unable to explain why she took direction from Craig Turturo, one of the orchestrators of the fraud, but who claimed to have no role in the transactions. (*See* Trial Tr. vol. 1, 129:6-130:25 (Bensema)). The timing of the closings allowed the sellers to use Old Bank's funds to pay the down payment on the second transaction. *Id.* at 223:24-224:2 (Newbold). The evidence suggests that Ms. Bensema recklessly disregarded her obligations to Old Bank because she knew Mr. Ray was involved in a scheme with Craig Turturo. Ms. Bensema knew that Old Bank would not receive the wire transfer documents that listed Masterhost—not Mr. Ray—as the originator, and she additionally knew that the ledger she provided to Old Bank omitted this information. *See id.* at 123:10-124:2 (Bensema); (Trial Exh. J-44, J-48).

Ms. Bensema deliberately closed her eyes to the existence of the mortgage fraud. Ignoring evidence that Mr. Ray was a straw buyer during the closing and that his down payment was not sent by him, but "for [his] benefit" by an unknown third party, does not reflect reasonably prudent supervision. It demonstrates Ms. Bensema's intentional complicity, if not direct involvement in the scheme. The circumstantial evidence demonstrates that Ms. Bensema acted intentionally, with the willful blindness necessary to allow the mortgage fraud scheme to occur. The FDIC met its burden in showing PTS acted with the dishonesty necessary to trigger indemnification under the CPLs.

(3)    *Causation*

First American asks the Court to find that the FDIC failed to prove that Old Bank would not have issued the Loans had it known about the Masterhost wire transfers. First American contends that the FDIC should have provided testimony regarding Old Bank's underwriting practices or what Old Bank would have done had PTS notified it that Mr. Ray had not paid the down payments as required in the Closing Instructions. Under Florida law, "the term 'arising out of' is broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.'" *Taurus Holdings, Inc. v. U.S. Fidelity and Guar. Co.*, 913 So.2d 528, 539–40 (Fla. 2005) (citations omitted). Accordingly, use of the term "requires more than a mere coincidence between the conduct . . . and the injury. It requires 'some causal connection, or relationship.' But it does not require proximate cause." *Id.* (citations omitted).

Accordingly, First American's emphasis on what Old Bank would have done with the information is misplaced. The FDIC does not have to prove that Old Bank would not have funded the Loans had it known of Masterhost. Instead, the FDIC had to show a causal connection or relationship between PTS's conduct and the injury. The FDIC has done so. As discussed above, PTS's failure to abide by Old Bank's Closing Instructions and PTS's engagement in dishonesty resulted in Old Bank funding two loans to a straw buyer with no "skin in the game," who defaulted less than six months after the closings. *See Chase*, 795 F.Supp.2d at 632 (finding that closing agent's fraud "was the most direct, natural, and foreseeable cause of" the loss).

By refusing to reimburse the FDIC for PTS's conduct that triggered indemnification, First American breached the CPLs.   Therefore, I find that the FDIC met its burden in demonstrating that First American breached the CPLs at issue in this matter.

## C.   *Damages*

Under the CPLs, the FDIC is entitled to reimbursement from First American of "actual loss" incurred in connection with the closings conducted by PTS.  During the Ray closings, PTS acted with dishonesty and failed to follow the Closing Instructions that allowed Mr. Ray to procure the Loans by fraud.  Since Mr. Ray was a straw mortgagor, he had no incentive to maintain the two properties and pay the mortgage premiums.  Mr. Ray defaulted on the Loans after making only four payments.  The damages were mitigated on the Loans through foreclosure proceeding and the selling of Units 206 and 308.  However, the sale proceeds did not result in recovering all actual losses.  The FDIC seeks to recoup its actual losses that resulted from PTS's misconduct.

A party seeking damages must show actual damages, which "are real, substantial and just damages, or the amount awarded to a complainant in compensation for his actual and real loss or injury."  *McMillian v. FDIC*, 81 F.3d 1041, 1055 (11th Cir.1996) (internal quotation marks omitted).  However, uncertainty as to the amount of damages, or difficulty in proving the exact amount, will not prevent recovery where substantial damages were suffered and there "is a reasonable basis in the evidence for the amount awarded."  *Centex-Rooney Constr. Co. v. Martin Cnty.*, 706 So.2d 20, 28 (Fla. 4th Dist. Ct. App. 1997) (quoting *Adams v. Dreyfus Interstate Dev. Corp.*, 352 So.2d 76, 78 (Fla. 4th Dist. Ct. App. 1977).  Actual damages do not have to be proven "with mathematical precision and may be estimated in any manner which is reasonable under the circumstances."  *HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 879 (11th Cir. 2005)

(citations omitted) (internal quotation marks omitted) (discussing damages as they relate to the value of expected profits); *see also Smith v. Austin Dev. Co.*, 538 So.2d 128, 129 (Fla. 2d Dist. Ct. App. 1989); *R.A. Jones & Sons, Inc. v. Holman*, 470 So.2d 60, 69–70 (Fla. 3d Dist. Ct. App. 1985) ("The standard for the degree of certainty requires that the mind of a prudent impartial person be satisfied with the damages.").

First American argues that the FDIC should not recover any damages since the FDIC did not offer any evidence detailing how much it recovered from New Bank under the P&A Agreement.  Under the Agreement, the FDIC transferred the Loans in dispute at book value. First American contends that since the FDIC has not provided the book value amount, its actual losses are speculative and cannot be calculated.

First American cites to *Chase* to support its argument.  In *Chase*, the court found that there was a genuine issue of material fact regarding the FDIC's damages because of its sale of the disputed loans to the new bank.  The court explained that the amount for which the loans were transferred to the new bank was material for purposes of summary judgment considerations "because that amount reduces [Old Bank's] 'actual loss,' which directly affects the amount of First American's liability under the CPL."  *Chase*, 795 F.Supp.2d at 634; *see also FDIC v. Thompson & Knight*, 816 F.Supp. 1123, 1131 (N.D. Tex. 1993) (finding that the FDIC "received [the] 'full face value' [of the loans in dispute] in exchange for their transfer" to the new bank since the loans were transferred at "book value").

Here, however, the FDIC is not required to offer evidence of actual loss with mathematical precision.  Under the reasonable certainty rule, recovery is only denied if the FDIC fails to establish damages to a reasonable degree of certainty.  *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1212 (11th Cir. 2006).  Contrary to First American's argument,

had the FDIC attempted to calculate the book value of the Loans when they were transferred to New Bank, I would have had to find that the damages were too speculative.

Under the P&A Agreement, New Bank received an estimated $11.8 billion worth of loans as a unit, among other assets, and assumed Old Bank's liabilities.[28]   The FDIC cannot determine the value of the Loans when it transferred them to New Bank.  (See Trial Tr. vol. 2, 70:7-71:17 (Newbold)).   The FDIC's main responsibility when it becomes the receiver of a failing bank is to determine a cost-effective and efficient method of dealing with the bank's assets and liabilities. *See FDIC v. Harrison*, 735 F.2d 408, 412 (11th Cir. 1984) (describing the FDIC's role as receiver); FDIC, MANAGING THE CRISIS: THE FDIC AND RTC 215-217 (1998) (same).  As receiver, the FDIC attempts to ensure service continuity and that panicked depositors do not withdraw their funds from the bank.  *Id.*  In the midst of a bank closing, to require the FDIC to provide a calculation of the book value of each loan in a failing bank's portfolio as of the date of the transfer for fear that the FDIC would later discover a mortgage fraud scheme, or some other claim, would be impractical.

The FDIC need only establish a reasonable basis for calculating damages and it has done so.  The FDIC provided two methods for calculating its damages: (1) the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1821(l),[29] method of

---

[28] The P&A Agreement was a negative transaction for the FDIC.  The FDIC paid New Bank $4 billion to take over the entire bank. (*See* Trial Tr. vol. 2, 63:2-70:6 (Newbold)).  Although New Bank obtained an estimated $11.8 billion worth of loans as one unit, the fact that the FDIC had to pay New Bank to accept Old Bank's loans puts into question whether any of the loans had any value at all.

[29] Section § 1821(l) of FIRREA states:

> In any proceeding related to any claim against an insured depository institution's director, officer, employee, agent, attorney, accountant, appraiser, or any other party employed by or providing services to an insured deposition institution, recoverable damages determined to result from the improvident or otherwise

principal losses and interest minus any funds its received through the foreclosure proceeding; or (2) the net realized after foreclosure and sale of the property securing the loan. In either formula, the FDIC asks the Court to consider the loss at the time the properties were sold. Calculating the loss applying either formula, the FDIC contends, results in the same loss amount.

Applying the net realized calculation, Formula (2), would be consistent with the CPL's indemnification for actual loss. In *First American Title Ins. Co. v. Vision Mortgage Corp.*, 689 A.2d 154 (N.J. Super. Ct. App. Div. 1997) (hereinafter "*Vision Mortgage*"), a New Jersey court interpreted identical CPL language regarding "actual loss" and found that it was the outstanding loan balance less the sales proceeds of the collateral property. In *Vision Mortgage*, the court found that, because of First American's agent's fraud, there was no bona fide mortgagor to make mortgage payments and that the loss should be calculated from the foreclosure sale.[30] *Id.* at 157; *see also Attorneys' Title*, No. 10-cv-21197, slip op. at 8 (S.D. Fla. May 17, 2011) (adopting the logic of *Vision Mortgage*). I find *Vision Mortgage*'s interpretation of actual loss persuasive and find that "actual loss" under the CPLs requires the calculation of the net realized after foreclosure and sale of the properties securing the Loans in this matter. Using the net sale proceeds provides more certainty and a more reasonable calculation of damages where, as here, the FDIC, as receiver, transferred the Loans through a P&A Agreement with New Bank at book value.

---

improper use or investment of any insured depository institution's assets shall include principal losses and appropriate interest.

12 U.S.C. § 1821(l)
[30] First American contends that *Vision Mortgage* is not relevant to measuring damages where the underlying notes and mortgages are transferred to a third party, but I disagree. Whether the FDIC incurred an actual loss is the question at bar, not whether it still owns the Ray Loans. Calculating the damages at the foreclosure sale allows for certainty and is a reasonable basis for valuing the Loans at issue.

Since the record contains sufficient evidence of the total debt—unpaid principal balance, accrued interest, and taxes, insurance, and other expenses—and the net proceeds from the sale of each property, I find that FDIC has met its burden in proving its actual damages in the instant matter. Since the FDIC has shown actual losses, I find that the resultant damages suffered from PTS's misconduct are calculated as follows:

      (1)   *Unit 206*

| | |
|---|---:|
| Unpaid Principal Balance | $278,904.90 |
| + Accrued Interest | + $38,917.70 |
| + Taxes/Insurance/Other Expenses | + $19,589.80 |
| TOTAL DEBT | $336,912.46 |

| | |
|---|---:|
| Total Debt | $336,912.46 |
| - Net Sale Proceeds | - $71,361.74 |
| **TOTAL LOSS** | **$265,550.72** |

      (2)   *Unit 308*

| | |
|---|---:|
| Unpaid Principal Balance | $278,904.90 |
| + Accrued Interest | + $25,468.15 |
| + Taxes/Insurance/Other Expenses | + $3,774.31 |
| TOTAL DEBT | $308,183.36 |

| | |
|---|---:|
| Total Debt | $308,183.36 |
| - Net Sale Proceeds | - $72,762.29 |
| **TOTAL LOSS**[31] | **$235,421.07** |

## III.   CONCLUSION

Based upon the Court's findings set forth above, the FDIC has established by a preponderance of the evidence that First American has breached the CPLs. For these reasons,

---

[31] Even though the FDIC received $79,012.82 from its insurance policy on Unit 308, under Florida's collateral source rule, "an injured party [is permitted] to recover full compensatory damages from a tortfeasor irrespective of the payment of any element of those damages by a source independent of the tortfeasor . . . .'" *Gormley v. GTE Products Corp.*, 587 So. 2d 455, 459 (Fla. 1991) (plurality opinion) (per curiam) (quoting 3 Jerome H. Nates *et al.*, DAMAGES IN TORT ACTIONS § 17 (1988)). Therefore, the FDIC's damages shall not be offset by the insurance benefits.

Judgment is entered in favor of the FDIC as to its breach of contract claims against First American, which are Counts IV and VIII of the Complaint.  Judgment should be entered in favor of the FDIC against First American in the amount of $265,550.72 as to Count IV and $235,421.07 as to Count VIII by separate order.

**DONE AND ORDERED** in Chambers in West Palm Beach, Florida, this 7 day of October, 2013.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:      Counsel of Record